**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ELLEN SMOAK** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:25-cv-919** |
| | § | |
| | § | |
| **BIOHEALTH RX, LLC, EDWARD COKE** | § | **JURY DEMANDED** |
| **MANN III, and EDWARD COKE MANN** | § | |
| **IV** | § | |
| | § | |
| *Defendants.* | § | |

### Affidavit of Edward Coke Mann, IV

BEFORE ME, the undersigned authority, on this day personally appeared Edward Coke "Coke" Mann, IV, who under oath stated as follows:

1.      My name is Coke Mann. I am over eighteen (18) years old and I am legally competent to make this affidavit. The statements in this affidavit are true, based on my personal knowledge, and made voluntarily without duress.

2.      I reside at 318 Country Club Drive, Columbia, SC 29206.

3.      I was served with a copy of the summons and petition in this lawsuit on March 19, 2025 at or around 3:30 pm.

4.      The photographs attached to the proofs of service filed by Ellen Smoak's counsel show my residence and the front door to my residence.

5.      My father, Edward Coke "Bud" Mann, III, was not at my residence on March 19, 2025 at 3:30 pm or anytime that day.

**EXHIBIT**

**1**

01

6.    I have never had authority to accept service of the summons and complaint on behalf of my father, Bud Mann.

7.    In or around July 2024, I proposed an Operating Agreement for BioHealth to Ellen Smoak, in which she would be provided 50 Profit Units Interests in the Company.

8.    On or about July 29, 2024, Smoak executed the BioHealth Operating Agreement.

9.    On or about August 2, 2024, I counter-signed the BioHealth Operating Agreement.

10.    A true and correct copy of the BioHealth Operating Agreement executed by me and Ellen Smoak is attached as **Exhibit A**.

Further affiant sayeth naught.

_____
Edward "Coke" Mann, IV

Sworn to and subscribed before me

this _21th_ day of April, 2025.

_____
Notary Public for South Carolina

My Commission Expires: _October 17 2034_

SANDRA WASHINGTON
Notary Public
State of South Carolina
My Commission Expires Oct 17, 2034

02

<u>**THIS AGREEMENT IS SUBJECT TO AN ARBITRATION PROVISION**</u>
<u>**PURSUANT TO THE SOUTH CAROLINA UNIFORM ARBITRATION ACT**</u>
<u>**(SOUTH CAROLINA CODE SECTIONS 15-48-10, ET. SEQ.)**</u>

**OPERATING AGREEMENT**
**OF**
**BIOHEALTH RX, LLC**

THIS **OPERATING AGREEMENT** (the "<u>Agreement</u>") of BIOHEALTH RX, LLC a South Carolina limited liability company (the "<u>LLC</u>"), is hereby adopted by COLUMBIA HEALTH LLC, a South Carolina limited liability company ("<u>CH</u>"), to be effective as of June [●], 2024 (the "<u>Effective Date</u>").

**RECITALS:**

**WHEREAS**, the LLC was organized at the direction of CH as a South Carolina limited liability company by the filing of Articles pursuant to the South Carolina Uniform Limited Liability Company Act of 1996 (the "<u>Act</u>") and the issuance of a certificate of organization for the LLC by the Secretary of State of South Carolina. The LLC was organized to acquire certain assets used in connection with the operation of a sterile compounding pharmacy qualifying under Section 503A of the Federal Food, Drug, and Cosmetic Act (the "<u>Business</u>");

**WHEREAS,** CH, in its capacity as the initial Member of the LLC and owner of all initially issued Common Units, has offered Profits Interest Units in the LLC to certain valued employees associated with CH and the LLC;

**WHEREAS**, the undersigned Members and Manager desire to enter into this Agreement to provide for the management of the business and the affairs of the LLC, the allocation of profits and losses, the distribution of cash of the LLC among the Members, the rights, obligations, and interests of the Members to each other and to the LLC, and certain other matters.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**SECTION 1**
**Name, Term, and Definitions**

1.1.    <u>Name</u>.  The LLC's name is bioHEALTH RX, LLC.

1.2.    <u>At-Will Company</u>.  The LLC shall be an "at-will company," as that term is defined in the Act.

1.3.    <u>Definitions</u>.  The capitalized words and phrases used in this Agreement shall have the meanings specified in <u>Section 14</u> below or in other portions of this Agreement.

**SECTION 2**
**Nature of Business, Designated Office, and Agent**

2.1.    <u>Business</u>.  The LLC is formed to hold and benefit from an investment in the Business and to make such other investments and transact such other related business as the Manager may deem appropriate for the LLC.

*bioHEALTH RX, LLC*                              1                    **EXHIBIT A**                    *Operating Agreement*

2.2.    Designated Office.  The LLC's Designated Office is at 1845 St. Julian Place, Columbia, South Carolina 29204, although the Members may change the LLC's Designated Office to another location and add additional places of business.

2.3.    Agent.  The LLC's agent for service of process shall be Edward C. Mann, IV at 1845 St. Julian Place, Columbia, South Carolina 29204.

2.4.    Principal Place of Business.  The LLC's Designated Office shall be its principal place of business.

2.5.    Income Tax Election.  The LLC shall be taxed as a partnership for state and federal income tax purposes, and the LLC shall make all elections necessary and file all documents and forms required to obtain and maintain such income tax treatment for the LLC and the Members.

2.6.    Construction.  If and to the extent the provisions of this Agreement conflict with the Act, this Agreement shall control.  If and to the extent the provisions of this Agreement do not conflict with the Act, the Act shall control.

### SECTION 3
### Capital and Membership Interests

3.1.    Membership Interests.  The Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided among various classes ("Classes"), each having the various rights, preferences, powers, qualifications, limitations, and restrictions as set forth herein (as may be amended from time to time).  All Units will be personal property for all purposes and no Member has any interest in specific LLC property.  As of the Effective Date, the LLC has created two (2) Classes of Units, Common Units and Profits Interest Units, and has issued Units from each Class to the Members as set forth on Exhibit A, attached hereto.

3.1.1.    Profits Interest Units.  Profits Interest Units shall be issued only in exchange for the provision of services by the recipient to or for the benefit of CH or the LLC and shall constitute a "profits interest" within the meaning of Revenue Procedure 93-27 and Revenue Procedure 2001-43.  The LLC and each Profits Interest Member shall comply with the provisions of Rev. Proc. 2001-43 with respect to all Profits Interest Units and shall not perform any act or take any position inconsistent therewith.  Each Profits Interest Member shall be treated as the owner of his or her Profits Interest Units from the date of his or her receipt thereof and shall thereafter take into account their respective distributive shares of Net Income, Net Loss, income, gain, loss, and deduction in which a Profits Interest Member is entitled to participate in accordance with the terms of this Agreement.  Profits Interest Members shall join in this Agreement by execution of a separate Joinder Agreement, the form of which is attached hereto as Exhibit C.

3.1.2.    Qualifications Regarding Profits Interest Units.  Profits Interest Members shall be entitled to participate in the profits of the Business, by virtue of their respective Profits Interest Units if they are employed by CH or the LLC at the time that the Business commences operation.  For example, if Profits Interest Members A and B are each issued five (5) Profits Interest Units on July 1, 2024 and (a) the LLC completes and commences operations of the Business on November 1, 2024 and (b) Profits Interest Members A and B are both employed by CH or the LLC on November 1, 2024, then (c) both Profits Interest Members A and B would participate in the Business as provided in this Agreement from July 1, 2024 onward.  If,

however, (a) Profits Interest Member A were to cease being employed by CH or the LLC prior to November 1, 2024, the date that the LLC completes and commences operations of the Business, then (b) only Profits Interest Member B would participate in the Business as provided in this Agreement from July 1, 2024 onward.

      3.1.3.    Issuance of Additional Units. The LLC may issue additional Units of any Class to any person, subject to any terms and restrictions deemed appropriate, as authorized by a Supermajority Vote, provided that any additional Units issued pursuant to this Agreement shall be subordinate to the Common Units. Any dilution resulting from the issuance of additional Units shall be shared, pro rata, by all issued and outstanding Units at the time of such issuance. Notwithstanding the foregoing or anything herein to the contrary, the LLC shall issue fifty (50) additional Profits Interest Units to John Cho upon the competition and successful implementation of a production automation system to be used in the operation of the Business.

      3.1.4.    Additional Classes. The LLC shall have the right to create additional Classes of Units with different terms and conditions, including terms that are senior to, *pari pasu*, or subordinate to other Classes, as determined appropriate by a Supermajority Vote. Notwithstanding the foregoing or anything herein to the contrary, any additional Classes of Units created pursuant to this Agreement shall be subordinate to the Common Units.

    3.2.    Deficit Capital Accounts. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from deductions and losses of the LLC (including non-cash items such as Depreciation) or distributions of money pursuant to this Agreement, upon dissolution of the LLC such deficit shall not be an asset of the LLC and such Members shall not be obligated to contribute such amount to the LLC to bring the balance of such Member's Capital Account to zero (0).

    3.3.    Adjustments. A separate Capital Account shall be maintained and adjusted for each Member for each class of Units on the books and records of the LLC in accordance with the Code, the Regulations, and the terms of this Agreement. Each Member's Capital Account shall be adjusted as necessary to reflect the economic conditions of the Membership Interests. These adjustments shall include, but are not limited to, the following:

      3.3.1.    Adjustments to reflect each Member's distributive share of the Net Profit and Net Losses of the LLC, including capital gains and losses, and tax-exempt income;

      3.3.2.    Adjustments to reflect each Member's additional contributions to the LLC;

      3.3.3.    Adjustments to reflect distributions made by the LLC to each Member; and

      3.3.4.    Tax-Sensitive Adjustments.

    3.4.    Loans. A Member's loans to the LLC shall not be added to his, her, or its Capital Account.

    3.5.    Amount of Contributions. The amount of a Member's contributions of property to the LLC and of the LLC's distributions of property to a Member, shall be reflected in the Member's Capital Account at the Fair Market Value of the property on the date of the contribution or distribution, reduced by any liabilities secured by that property, if those liabilities are treated under applicable federal income tax laws as being assumed by or taken subject to by the transferee. The initial capital contributions of the Members,

once finally determined, shall be reflected on Exhibit A. Absent approval by a Supermajority Vote, any additional capital contributions made to the LLC by the Members shall not be considered an Outstanding Preferred Contribution.

3.6.    No Interest Paid. No Member shall receive interest on his, her, or its capital contributions or Membership Interest.

3.7.    Withdrawals. No Member may withdraw his, her, or its Capital Account except as expressly authorized in this Agreement.

3.8.    Securities Laws. Each Member hereby agrees, represents, and warrants that such Member (i) is acquiring Membership Interests in the LLC (represented by one (1) or more Units) for the Member's own account as an investment; (ii) acknowledges that the Units have not been registered under the Securities Laws, and may not be resold or transferred by the Member without appropriate registration or the availability of an exemption from such requirements; and (iii) the Member agrees to the terms of this Agreement and to perform the Member's obligations hereunder.

3.9.    [Additional Capital Contributions. Additional contributions to the LLC's capital may be called for by the Manager and all Members shall be notified in writing of the purpose and amount of such additional capital contributions. All such additional capital contributions shall be made in proportion to the Members' respective percentages of Membership Interest. In the event that a Member fails to make any such additional capital contribution within ten (10) days of such written notice, then such Member shall be in breach of their obligations under this Agreement, and the LLC and the other Members shall have the rights and remedies set forth in this Agreement.

3.9.1.    Delinquent Amounts as Nonrecourse Debt.    The Members hereby acknowledge and agree that the obligation of any Member to make additional capital contributions under Section 3.9 is a nonrecourse liability of such Member and that, in the event such Member becomes delinquent in the payment of any such obligation, the LLC's and the other Members rights and remedies are strictly limited to those prescribed in this Agreement.

3.9.2.    Voluntary Contributions by Nondelinquent Members. In the event that a Member fails to make any required additional capital contribution at the time such contribution is due (the "Delinquent Member"), then the Members properly making such required contributions (the "Nondelinquent Members") may, by a Majority Vote of such Nondelinquent Members, invoke the following procedure to permit the Nondelinquent Members to contribute the additional capital contribution not made (the "Delinquent Contribution") on behalf of the Delinquent Member. Such procedure shall be invoked by giving notice (the "Voluntary Contribution Notice") to all of the Nondelinquent Members, with a copy to the Delinquent Member. A Voluntary Contribution Notice shall state the following: (1) the balance of the Delinquent Contribution on the date of such notice; (2) the portion of such Delinquent Contribution that each Nondelinquent Member may contribute hereunder; (3) the amount of additional distributions that the Nondelinquent Members will be entitled to receive if they choose to contribute a portion of such Delinquent Contribution; and (4) the date (the "Contribution Date") on or before which each such Nondelinquent Member may elect to make all or any portion of his share of such capital contribution by delivery to the LLC of cash in an amount up to such Nondelinquent Member's share of such Delinquent Contribution. The Contribution Date shall in no event be earlier than the fifteenth (15th) day or later than the thirtieth (30th) day following the date of the Voluntary Contribution Notice.

(a)    Each Nondelinquent Member shall be entitled to contribute an amount up to that portion of the Delinquent Contribution that corresponds to the ratio that their Membership Interest bears to the Membership Interests of all Nondelinquent Members. Any such contribution by Nondelinquent Members shall be treated as having been made by the Delinquent Member for all purposes of the Agreement other than this Section 3.9.

(b)    In the event that the Nondelinquent Members do not elect to contribute the full amount of the Delinquent Contribution prior to the Contribution Date, any other Member may, in his sole discretion, within ten (10) days after such Contribution Date, make all or any portion of the remainder of such Delinquent Contribution.

3.9.3.    Effect of Voluntary Contributions On Delinquent Contribution. Upon the making of any voluntary capital contribution by a Nondelinquent Member pursuant to this Section, such capital contribution shall be applied to reduce the Delinquent Contribution. Any payment made by the Delinquent Member during the operation of the procedure established by this Section shall not be applied to reduce the Delinquent Contribution. Instead, an amount equal to such payment shall constitute a non-interest bearing obligation of the LLC to the Delinquent Member, which obligation shall be satisfied at the termination of such procedure by offsetting such obligation against any remaining Delinquent Contribution and returning any excess of such payment over such remaining Delinquent Contribution to the Delinquent Member.

3.9.4.    Shifting of Distributions. Following voluntary capital contributions by Nondelinquent Members under the procedure provided above, all amounts otherwise distributable hereunder to the Delinquent Member whose Delinquent Contribution was thereby reduced shall be made to such Nondelinquent Members until the aggregate amount of such distributions equals one hundred fifteen percent (115%) of the amount of such capital contributions. All amounts distributed to any Nondelinquent Member pursuant to this Section shall be treated as having been distributed to the Delinquent Member for all other purposes of this Agreement. In the event that more than one Nondelinquent Member makes a voluntary additional capital contribution hereunder with respect to a Delinquent Contribution of a Delinquent Member, all distributions required hereby to be made to such Nondelinquent Members shall be apportioned among such Nondelinquent Members according to the relative additional capital contributions so made by them.

3.9.5.    Limitation. In the event the procedure provided in this Section is invoked with respect to a Delinquent Member, it may not again be invoked with respect to such Delinquent Member until all payments to Nondelinquent Members called for by this Section attributable to such Delinquent Member have been made.][1]

## SECTION 4
### Allocations and Distributions

4.1.    Allocations.

4.1.1.    Allocations of Net Profit and Net Loss. After making any Regulatory Allocations and subject to the last two sentences of this Section 4.1.1, Net Profit and Net Loss shall be allocated annually (and such other times in which it is necessary to allocate Net Profit or Net Loss) in a manner such that, after such allocations have been made, the balance of each Member's

---

[1] **Note to Draft**: Need to confirm whether capital call provision is applicable here.

*bioHEALTH RX, LLC*                    5                    *Operating Agreement*

Capital Account shall, to the extent possible, equal (i) the amount of cash that would be distributed to the Member if (A) the LLC were to liquidate its assets for an amount equal to their Gross Asset Values, (B) all LLC liabilities were satisfied (limited with respect to each nonrecourse liability to the Gross Asset Values of the assets securing such liabilities), and (C) the net proceeds were distributed to the Members in liquidation pursuant to Section 12.2.4, minus (ii) the sum of (A) such Member's share of "partnership minimum gain" (as determined under Regulations §§ 1.704-2(d) and (g)(3)) and "partner minimum gain" (as determined under Regulations § 1.704-2(i)), and (B) the amount, if any, that such Member is obligated (or is deemed obligated or federal income tax purposes) to contribute, in its capacity as a Member, to the capital of the LLC; in each case computed immediately prior to the hypothetical sale of assets. Notwithstanding the foregoing, in no event shall the Net Losses (or items of loss or deduction) allocated to any Member cause the Member to have an Adjusted Capital Account Deficit or increase an Adjusted Capital Account Deficit for any Member. Any amounts not allocated to a Member pursuant to the limitations set forth in this paragraph shall be allocated to the other Members to the extent possible without violating the limitations set forth in this paragraph, and any amounts remaining to be allocated shall be allocated among such other Members in accordance with the relative Membership Interests of such other Members.

4.1.2.    Special Allocations.  Notwithstanding this general rule, any income, gain, loss, and deduction with respect to property contributed to the LLC by a Member shall be shared among the Members so as to take account of any variation between the basis and the Fair Market Value of the contributed property at the time of the contribution, in accordance with any applicable U.S. Treasury Regulations and the LLC shall make the regulatory allocations as provided and required by the provisions contained in Exhibit B.

4.1.3.    Allocations Attributable to Particular Periods. For purposes of determining profits, losses, or any other items allocable to any period, such items shall be determined on a daily, monthly, or other basis, as determined by the Members using any permissible method under Code Section 706 and the Regulations thereunder.

4.1.4.    Tax Consequences.  The Members are aware of the income tax consequences of the allocations made by this Section 4.1 and hereby agree to be bound thereby as reflected on the income tax returns of the LLC in reporting their respective shares of LLC profits and losses for federal income tax purposes.

4.2.    Distributions.

4.2.1.    Distributions of Net Cash Flow.  Subject to the provisions of Section 4.3 hereof, if the Manager determines after taking into account the anticipated capital needs of the LLC, that Net Cash Flow, excluding Net Cash Flow from Sale, for any fiscal quarter is available for distribution, such distribution shall be made to the Members on a quarterly basis, or more frequently if determined appropriate by the Manager, to each Member in accordance with the following order of priority:

4.2.1.1. First, after taking into account all amounts previously distributed to the Members, to the Members holding Common Units until their respective Outstanding Preferred Contribution balances, if any, are reduced to zero (0);

4.2.1.2. Second, to the Members pro rata in accordance with their respective Membership Interests.

08

4.2.2.  Net Cash Flow from Sale. Subject to the provisions of Section 4.3 hereof, the LLC shall distribute Net Cash Flow from Sale to all Members in accordance with the following order of priority:

4.2.2.1. First, after taking into account all amounts previously distributed to the Members, to the Members holding Common Units until their respective Outstanding Preferred Contribution balances, if any, are reduced to zero (0); and

4.2.2.2 Second, to the Members pro rata in accordance with their respective Membership Interests.

4.3.  Limitations on Distributions. No distribution shall be declared and paid if payment of the distribution would cause the LLC to violate (i) any covenant set forth in the Loan Documents (as defined below) or (ii) limitations on distributions provided in the Act. The Managing Member shall have the sole discretion to determine the timing of any distributions to the Members.

4.4.  Assignment, Death, or Dissolution. When a Member dies, retires, dissolves, or assigns their Membership Interest, profits and losses shall be allocated based on the number of days in that year during which each Member owned a Membership Interest, or on any other reasonable basis selected by the remaining Members, as long as it is consistent with applicable United States tax laws and regulations.

4.5.  Tax Distributions. Subject to applicable law and to the extent of available Net Cash Flow, the LLC shall distribute to each Member during each fiscal year, an amount equal to forty-four percent (44%) (or such greater or lesser percentage as the Manager may determine in good faith from time to time, to represent the sum of the maximum marginal federal and state income tax rates applicable to any Member (or individual beneficial owner thereof) for the applicable fiscal year) of the taxable income of the LLC allocated to such Member for the applicable fiscal year. Distributions pursuant to Section 4.2 shall be applied against and reduce the amount to be distributed pursuant to this Section 4.5. Distributions pursuant to this Section 4.5 shall be deemed to be advances against distributions to which such Member would otherwise be entitled under this Agreement.

## SECTION 5
### Management

5.1.  Management. Except as noted in Section 5.2, CH (the "Manager") shall have the full and exclusive power to manage the Company's affairs on the Company's behalf and to do or cause to be done anything deemed necessary or appropriate for the Company's business. Without limiting the generality of the foregoing, the Manager shall have the power to authorize and cause the Company to do the following in the ordinary course of the Business:

5.1.1.  sell real or personal property (not constituting all or substantially all of the real or personal property of the Company) to any person, giving any warranties or assurances deemed appropriate;

5.1.2.  buy, lease, or otherwise acquire real or personal property to carry on and conduct the Company's business;

5.1.3.  borrow money for the Company's business in an amount not to exceed $100,000;

5.1.4.  issue promissory notes and other debt instruments (negotiable or nonnegotiable), in an amount not to exceed $100,000;

5.1.5.   assign any debts owing to the Company;

5.1.6.   manage, administer, conserve, improve, develop, operate, lease, utilize, and defend the Company's assets, directly or through third parties;

5.1.7.   execute any type of agreement or instrument in connection with any other Company power;

5.1.8.   employ all types of agents and employees (including lawyers and accountants) and pay them reasonable compensation;

5.1.9.   buy or otherwise obtain the use of any type of equipment or other property that may be convenient or advisable in connection with any Company business;

5.1.10.   incur any reasonable expense for travel, telephone, insurance, taxes, and such other things in carrying on the Company's business; and

5.1.11.   sue and be sued, complain, and defend in the name of and on behalf of the Company.

5.2.   Supermajority Vote Required.   The following matters shall require approval by Supermajority Vote:

5.2.1.   any actions described in Section 5.1 above that are outside the ordinary course of the Business;

5.2.2.   entering into any agreement for sharing of profits and any joint venture agreement with any Person engaging in any business or venture in which the Company may engage;

5.2.3.   entering into any agreement or transaction with an affiliate or any related party of a Member;

5.2.4.   the sale of all or substantially all of the assets of the Company, including but not limited to causing the Company to vote or approve the sale of the Business;

5.2.5.   the refinance, including but not limited to causing the Company to vote or approve, of the debt secured by the Business;

5.2.6.   issuing a capital call for additional capital contributions to the Company;

5.2.7.   any other matters requiring a Supermajority vote as provided in this Agreement; and

5.3.   Removal and Succession.   A Manager shall serve until he or she dies (or is dissolved if the Manager is an entity), resigns, or is removed by a Supermajority Vote (including the Manager, if the Manager is also a Member entitled to vote).

5.4.   Compensation and Guaranteed Payments.   If determined appropriate by Supermajority Vote, the Manager shall receive reasonable compensation for managing the Company. The Members, by Supermajority Vote, shall establish and may modify such compensation and all amounts so paid shall be treated as "guaranteed payments" under §707(c) of the Code.

5.5.    Expenses.  All reasonable expenses incurred by the Manager in managing and conducting the Company's business, including (but not limited to) overhead, administrative and travel expenses, and such professional, technical, and other services, shall be reimbursed by the Company.

5.6.    Appointment of Officers.  The Manager shall have the authority to appoint and remove executive officers of the Company if deemed desirable in the conduct of the Company's business.  Such officers may include a president, one (1) or more vice presidents, a secretary, or a treasurer and such individuals shall have the authority and perform such duties as the Manager may prescribe.

5.7.    Indemnification.  To the greatest extent permitted by the laws and public policies of the State of South Carolina, the Company shall indemnify and hold all Members, the Manager, and officers of the Company, and the officers, directors, stockholders, partners, members, employees, representatives, and agents of each, harmless from and against any claim, loss, liability, or damage, including attorneys' fees and court costs, arising out of or related to any act performed or omitted to be performed by any such Persons on behalf of the Company; *provided, however*, no such indemnity shall exist to the extent that any such Person is adjudged to be liable for intentional misconduct, gross negligence, or fraud.  The Company shall advance to any indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any such claim if such Person agrees in writing before any such advancement to reimburse the Company for all fees, costs, and expenses advanced to the extent that it is determined that such indemnified Person was not entitled to indemnification under this Section.

5.8.    Tax Representation.  Edward C. Mann, III shall serve as the "partnership representative" (as defined in Code § 6231(a)(7) prior to the enactment of the Bipartisan Budget Act of 2015) of the Company for taxable periods ending after December 31, 2017 (the "Tax Representative").  The Tax Representative shall be solely responsible for representing the Company in all dealings with the U.S. Internal Revenue Service and any state, local, and foreign tax authorities and shall keep the Members reasonably informed of any such dealings.

### SECTION 6
### Financial Reports and Other Information

Within a reasonable period after the close of each fiscal year, the Tax Representative shall, at the LLC's expense, give a written report to each Member indicating that Member's share of the LLC income or loss and any changes in that Member's Capital Account.  This requirement may be satisfied by giving each Member a copy of any tax form that includes such information.  Information regarding the number of Profits Interest Units issued to the Profits Interest Members will not be provided to the Profits Interest Members and the Manager shall have the right to omit or redact all such information from any documents or records that the Profits Interest Members might otherwise be entitled to pursuant to § 33-44-408 of the Act.

### SECTION 7
### Banking

All LLC funds shall be deposited in the LLC's name in such accounts as the Manager may designate.  The Manager may authorize other persons to draw checks on LLC bank accounts, but such authority must be in writing.

### SECTION 8
### Transfer of Membership Interests

8.1.    Restrictions on Transfers.  The Members do not want any Membership Interests to be made generally available to persons other than the present Members.  Therefore, the Members agree that no

Member will Transfer all or any portion of his, her, or its Membership Interest, whether now or hereafter acquired, except in accordance with the terms of this Agreement or with the prior written consent of all of the other Members. An attempted Transfer of any Membership Interest that is not in accordance with the terms of this Agreement shall not be reflected on the LLC's books.

      8.2.    <u>Right of First Refusal</u>. Any Member who wishes to Transfer all or any portion of his, her, or its Membership Interest, or who has reason to believe that an involuntary Transfer or a Transfer by operation of law is reasonably foreseeable (an "<u>Offering Member</u>"), shall immediately give each other Member written notice (an "<u>Offer Notice</u>") of the intent to Transfer such Membership Interest or of the knowledge that an involuntary Transfer or Transfer by operation of law is reasonably foreseeable. The Offer Notice must contain a description of the portion of Membership Interest to be Transferred (the "<u>Offered Interest</u>"), the total consideration (if any) to be paid therefor, including but not limited any debt to be assumed and the present value of all additional consideration to be paid to the Offering Member as incentive (including but not limited to any amount paid under side agreements, consulting contracts, employment contracts, or other agreements) (the "<u>Offer Price</u>"), the terms of the proposed Transfer and of the payment of consideration (including but not limited to the relative percentages of cash and debt, and the terms of any debt instruments) (the "<u>Offer Terms</u>"), the name, address (both home and office), and business or occupation of the person to whom the Offered Interest would be transferred, and any other facts which are or would reasonably be deemed material to the proposed Transfer.

          8.2.1.    <u>Effect of Offer Notice</u>. Effective immediately upon the delivery of any Offer Notice, the Offering Member shall be deemed to have offered to sell the Offered Interest to the Members and the LLC at the Agreement Price and on the Agreement Terms according to the terms of this <u>Section 8.2</u>.

          8.2.2.    CH shall have an initial option to buy the Offered Interest. CH may exercise this purchase option by giving the Offering Member and the other Members written notice of its intent to buy the Offered Interest within fifteen (15) days after receipt of the Offer Notice.

          8.2.3.    If CH does not elect to buy all of the Offered Interest, then all of the Members, including CH, shall have an option to buy that share of the Offered Interest having the same proportion to all of the Offering Member's Membership Interests as the buying Member's Membership Interests bears to the Membership Interests held by all Members (except the Offering Member). By agreement, the Members may elect to purchase the Offered Interest in such other proportion as they deem appropriate. Each Member may exercise this purchase option by giving the Offering Member written notice within fifteen (15) days after the lapse of the CH purchase option, if applicable.

          8.2.4.    If the Members, in the aggregate, do not agree to buy all of the Offered Interest, the Offering Member may complete the intended Transfer. If this Transfer is not completed within ten (10) days after expiration of the option period, any attempted Transfer shall be deemed made under a new offer and this Section shall again apply.

      8.3.    <u>Agreement Price</u>. The purchase price that the Members must pay for the Offered Interest under <u>Section 8.2</u> (the "<u>Agreement Price</u>") shall be either (a) that of any proposed Transfer if the proposed Transfer for which notice was given is a bona-fide, third-party transaction with consideration to be paid in cash, notes payable in cash, or any combination thereof, or (b) an amount equal to the proportion that the Offered Interest bears to all issued and outstanding Membership Interests, multiplied by the value of the LLC's assets reduced by any liabilities of the LLC if the proposed Transfer for which notice was given is not a bona-fide, third-party transaction with consideration to be paid as described above. The value of the

LLC's assets shall be determined by an independent appraisal performed by a professional appraiser selected by the Manager. The appraiser conducting the valuation of the LLC's assets pursuant to this Section shall be instructed to consider and include in their opinion an adjustment for estimated closing costs and expenses (e.g., commissions, recording fees, and legal fees and costs) that would customarily be incurred by the LLC in the event of an arm's length sale. The Offering Member and LLC shall each be responsible for one half of the cost of the appraisal.

      8.4.     Agreement Terms. The terms upon which the Agreement Price must be paid for:

          8.4.1.     any Offered Interest consisting of Profits Interest Units shall be payment by delivery of a promissory note in a principal amount equal to Agreement Price. No interest shall accrue with respect to such principal amount. The purchasers may prepay all or any part of the principal balance of the note at any time without penalty or premium; and

          8.4.2.     any Offered Interest consisting of Common Units shall be the payment of the Agreement Price at the closing for such purchase by the purchaser's delivery of (i) one-third (1/3) of the Agreement Price, payable in cash or by good personal check, and (ii) a promissory note, secured by such Offered Interest, in a principal amount equal to the remaining Agreement Price, providing for interest accruing at the Prime Rate and two (2) equal annual installments of principal and interest, beginning on the first anniversary of such closing. The purchasers may prepay all or any part of the principal balance of the note at any time without penalty or premium.

      8.5.     The Closing. The purchase of an Offered Interest purchased pursuant to Section 8.2 shall take place at a closing to be held not later than the thirtieth day after the earliest date on which each of the triggered purchase options have either expired or been exercised. The closing shall be held during normal business hours at the LLC's principal business office, or at any other place to which the parties agree. If the Offering Member is not present at the closing, then the purchasers shall deposit the purchase price by check, note, or both, as this Section 9 requires, with any state or federally chartered bank with which the LLC has an account, as escrow agent, to be paid to the Offering Member as soon as is reasonably practicable, less an appropriate fee to the LLC (not to exceed One Thousand and No/100 Dollars ($1,000.00)) to cover additional administrative costs, and the LLC shall adjust its books to reflect the transfer of the Offered Interest.

      8.6.     Permitted Transfers. Notwithstanding anything to the contrary, a Member may at any time make a Permitted Transfer of their respective Membership Interest; provided, however, that the assignee thereof shall not be deemed a Member entitled to cast any votes with respect to any Common Units included in the therein or otherwise participate in the management and affairs of the LLC unless and until such assignee is admitted as a Member pursuant to Section 10 below.

### SECTION 9
### Amendments

This Agreement and the Exhibits hereto may be updated and amended by the Manager to reflect any valid Transfers of Membership Interests, adjustments in valuations, the participation of Profits Interest Members, or other administrative matters. Otherwise, this Agreement shall be amended only pursuant to a Unanimous Vote. Any amendments that alter the economic rights associated with Units owned by a particular Member must be approved by such Member.

### SECTION 10
### Admission, Retirement, and Resignation of Members

10.1.    Admission.  A person may be admitted as an additional Member by a Unanimous Vote (excluding any Member transferring a Membership Interest to the prospective new Member).

    10.1.1.    Sole Discretion.  A Member need give no reason for voting not to admit an applicant as a new Member, and a Member may unreasonably withhold his, her, or its agreement to such admission.

    10.1.2.    Conditions of Admission.  In no event may any person be admitted as a new Member unless that person consents in writing to be bound by this Agreement, either through execution hereof or by joinder through another written agreement confirming that the terms of this Agreement are binding upon such person.  The LLC may, in its discretion, assess a fee not to exceed One Thousand and No/100 Dollars ($1,000.00) to cover costs of preparing, executing, and recording all pertinent documents.  Absent such Unanimous Vote, the individual to whom the Membership Interest was Transferred shall be an assignee and shall be entitled to share in the profits, losses, and distributions to which the assigning Member would have been entitled, but not to participate in the management and affairs of the LLC.

10.2.    Retirement and Resignation.  A Member may resign, withdraw, dissociate, or retire from the LLC only with the consent by Unanimous Vote.

### SECTION 11
### Dissolution

11.1.    Causes.  The LLC shall be dissolved upon the occurrence of any of the following events:

    11.1.1.    Approval by Unanimous Vote;

    11.1.2.    Any event that makes it unlawful for all or substantially all of the business of the LLC to be continued, but any cure of illegality within ninety (90) days after notice to the LLC of the event is effective retroactively to the date of the event for purposes of this Section;

    11.1.3.    The application by a Member or a dissociated Member, upon entry of a judicial decree as provided by § 33-44-801(4) of the Act; or

    11.1.4.    The filing by the Secretary of State of a certificate administratively dissolving the LLC pursuant to § 33-44-810 of the Act.

11.2.    Upon Dissolution.  Upon its dissolution, the LLC shall end and commence to wind up its affairs.  The Members shall continue to share in Net Profit and Net Loss during liquidation as they did before dissolution.  The LLC's assets may be sold, if a price deemed reasonable by the Members can be obtained.  The proceeds from liquidation of LLC assets shall be applied as follows:

    11.2.1.    First, all of the LLC's debts and liabilities to persons other than Members shall be paid and discharged in the order of priority as provided by law;

    11.2.2.    Second, all Outstanding Preferred Contribution Balances shall be paid and discharged on a pro rata basis (i.e., determined by reference to the aggregate amounts owed) until reduced to zero (0);

    11.2.3.    Third, all debts and liabilities to Members shall be paid and discharged in the order of priority as provided by law; and

11.2.4.     Fourth, all remaining assets shall be distributed among the Members in accordance with the terms of Section 4.2 hereof.

11.3.   Gain or Loss.  Any gain or loss on the disposition of LLC properties in the process of liquidation shall be credited or charged to the Members in accordance with the terms of Section 4 hereof. Any property distributed in kind in the liquidation shall be valued and treated as though it were sold at its Fair Market Value and the cash proceeds distributed.  The difference between the Fair Market Value of property distributed in kind and its book value shall be treated as a gain or loss on the sale of property and shall be credited or charged to the Members accordingly.

11.4.   LLC Assets Sole Source.  The Members shall look solely to the LLC's assets for the payment of any debts or liabilities owed by the LLC to the Members and for the return of their capital contributions and liquidation amounts.  If the LLC property remaining after the payment or discharge of all of its debts and liabilities to persons other than Members is insufficient to return the Members' capital contributions, they shall have no recourse therefor against the LLC or any other Members, except to the extent that such other Members may have outstanding debts or obligations owing to the LLC.

## SECTION 12
### Miscellaneous

12.1.   Notices.  Any notice under this Agreement shall be given and served either by personal delivery to the party to whom it is directed, or by registered or certified mail, postage and charges prepaid, and if it is sent to a Member, it shall be addressed with his, her, or its address as it appears on the records of the LLC.

12.1.1.     Date of Notice.  Any notice shall be deemed given when it is personally delivered, or, if mailed, on the date it is postmarked by the United States Postal Service, if it was addressed as required in this Section 12.1.

12.1.2.     Change of Address.  Any Member may change his, her, or its address for purposes of this Agreement by written notice to the other Members, stating his, her, or its new address.  A change of address shall be effective fifteen (15) days after the notice is received by the other Members.

12.2.   Non-Waiver.  Any party's failure to seek redress for violation of or to insist upon the strict performance of any provision of this Agreement shall not prevent a subsequent act that would have originally constituted a violation from having the effect of an original violation.

12.3.   Severability.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is invalid for any reason whatsoever, its invalidity shall not affect the validity of the remainder of the Agreement.

12.4.   Good Faith.  The performance of any act or the failure to do any act by a Member or the LLC, the effect of which causes any loss or damage to the LLC, shall not subject such Member or the LLC to any liability, if the decision to perform or the failure to perform such act was made pursuant to advice of the LLC's legal counsel or in good faith to promote the LLC's best interests.

12.5.   Governing Law.  This Agreement is to be construed according to the laws of South Carolina.

12.6.    Cumulative Rights.  The rights and remedies provided in this Agreement are cumulative and the use of any right or remedy does not limit a party's right to use any or all other remedies. All rights and remedies in this Agreement are in addition to any other legal rights the parties may have.

12.7.    Other Activities.  A Member may engage in whatever activities he or she chooses without any obligation to offer any interest in such activities to any party hereof provided such activities do not violate the Member's fiduciary duties of care and loyalty as provided by the Act.  The Members hereby acknowledge that they are presently separately engaged in various real estate investment, development, and management activities and that it is their intention that they may continue their independent pursuit of such activities free of any obligation to the Members, the LLC, or any affiliated entities.

12.8.    Confidentiality.  The Members acknowledge that as a result of their association with the LLC each Member will have access to and become acquainted with trade secrets, proprietary information, and confidential information belonging to the LLC and its affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements, and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists, and other business documents that the LLC treats as confidential (collectively, "Confidential Information").  In addition, the Members acknowledge that (a) the LLC has invested, and continues to invest, substantial time, expense, and specialized knowledge in developing its Confidential Information; (b) the Confidential Information provides the LLC with a competitive advantage over others in the marketplace; and (c) the LLC would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Therefore, without limiting the applicability of any other agreement to which any Member is subject, no Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the LLC or performing its duties as a Member, officer, employee, consultant, or other service provider of the LLC) at any time, including, without limitation, use for personal, commercial, or proprietary advantage or profit, either during its association or employment with the LLC or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

12.9.    Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had all signed the same document.  All counterparts shall be construed together and shall constitute one (1) agreement.

12.10.    Waiver of Partition.  Each Member waives any right to maintain any action for partition with respect to the LLC's property or assets during its term.

12.11.    Binding Terms.  The terms of this Agreement are binding upon and inure to the benefit of the parties and, to the extent permitted by this Agreement, their heirs, executors, administrators, legal representatives, successors, and assigns.

12.12.    Personal Property.  The interests of each Member in the LLC are personal property.

12.13.    Gender and Number.  Unless the context requires otherwise, the use of a masculine pronoun includes the feminine and the neuter, and vice versa, and the use of the singular includes the plural, and vice versa.

12.14.    Arbitration.  Any controversy or claim arising out of or related to this Agreement or the breach thereof, shall be settled, except as may otherwise be provided herein, by binding arbitration in accordance with South Carolina Code §§ 15-48-10, et. seq. and the arbitration award may be entered as a

final judgment in any court having jurisdiction thereon. Any dispute as to whether a controversy or claim is subject to arbitration shall be submitted as part of the arbitration proceeding. Legal costs, attorneys' fees, and the fees of expert witnesses may be assessed against any person found to have acted in bad faith. All arbitration proceedings shall be conducted by a panel of three (3) arbitrators. The party requesting arbitration shall have the right to select one (1) arbitrator and the person or persons on the other side of the controversy shall select a second arbitrator. The two (2) arbitrators so chosen shall select the third.

## SECTION 14
## Definitions

In addition to the terms defined elsewhere in this Agreement, the terms defined in this Section 14, when used in this Agreement with capital initial letters, shall have the meanings ascribed to them herein.

14.1.    Act. "Act" shall mean the South Carolina Uniform Limited Liability Company Act of 1996, §§ 33-44-101 et. seq. of the Code of Laws of South Carolina (1976), as amended, and any corresponding provisions of future laws.

14.2.    Agreement. The "Agreement" is this Operating Agreement for the LLC, as amended from time to time. The Agreement shall include all exhibits, as they may be amended from time to time.

14.3.    Articles. The term "Articles" shall refer to the Articles of Organization filed on behalf of the LLC, as may be amended from time to time.

14.4.    Capital Accounts. "Capital Account" means, with respect to each Member, the capital account maintained for such Member pursuant to the terms of this Agreement.

14.5.    Code. The "Code" is the Internal Revenue Code of 1986, as amended.

14.6.    Common Members. The "Common Members" means the holders of Common Units who have been admitted as Members of the LLC pursuant to the terms of this Agreement.

14.7.    Common Units. "Common Units" means the Units having the privileges, preference, duties, liabilities, obligations, and rights specified with respect to "Common Units" in this Agreement.

14.8.    Days and Months. "Day," "days," "month," and "months" refer to calendar days and months, including any days which fall on legal holidays or weekends.

14.9.    Depreciation. "Depreciation" means, for each fiscal year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable with respect to an asset for such fiscal year, except that if the Fair Market Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of the fiscal year Depreciation will be an amount which bears the same ratio to the beginning Fair Market Value as the federal income tax depreciation, amortization, or other cost recovery deduction for the fiscal year bears to the beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization, or other cost recovery deduction for the year is zero (0), Depreciation will be determined with reference to the beginning Fair Market Value using any reasonable method used by the Members.

14.10.    Fair Market Value. "Fair Market Value" means, with respect to any asset as of any date, the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined in good faith by the Manager based on such factors as the Manager,

17

in the exercise of their reasonable business judgment, considers relevant or with the assistance of an independent appraiser if deemed appropriate by the Manager.

    14.11.    Gross Asset Value. "Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

        14.11.1.    The Gross Asset Values of all LLC assets shall be adjusted to equal their respective gross fair market values (taking Section 7701(g) of the Code into account), as determined by the Manager, as of the following times: (A) the acquisition of additional Membership Interests in the LLC by any new or existing Member in exchange for more than a de minimis capital contribution; (B) the distribution by the LLC to a Member of more than a de minimis amount of property as consideration for Membership Interest; and (C) the "liquidation" of the LLC within the meaning of Regulations § 1.704-1(b)(2)(ii)(g) other than a liquidation described in Section 708(b)(1)(B) of the Code; provided, however, that adjustments pursuant to clauses (A) and (B) shall be made only if the Manager reasonably determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the LLC;

        14.11.2.    The Gross Asset Value of any LLC asset distributed to any Member shall be the gross fair market value of such asset, as determined by the Manager, on the date of distribution;

        14.11.3.    The Gross Asset Values of LLC assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations § 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this Section 14.11.3 to the extent the Manager determines that an adjustment pursuant to Section 14.11.1 is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this Section 14.11.3.

        14.11.4.    The Gross Asset Value of any asset contributed to the LLC shall be its agreed-upon fair market value, adjusted for book depreciation, amortization, or other cost recovery deduction for periods subsequent to its contribution in the manner provided in Section 14.18.4.

    For purposes of Sections 14.11.1 and 14.11.2, gross fair market value will be determined in accordance with the LLC's policies, accepted valuation techniques, and accounting practices.

    14.12.    LLC. The "LLC" is bioHEALTH RX, LLC.

    14.13.    Majority Vote. A "Majority Vote" of the Members means an affirmative vote or written approval of the Members holding more than fifty percent (50%) of the Common Units entitled to vote on that particular matter.

    14.14.    Members. The term "Members" shall refer to the Common Members and the Profits Interest Members.

    14.15.    Membership Interests. The term "Membership Interest" means the legal and equitable ownership interest in the LLC of a Member at any particular time, including, to the extent applicable: (i) a Member's status as a member of the LLC; (ii) a Member's share of the Net Profits and Net Losses of, and the right to receive distributions from, the LLC; (iii) all other rights, benefits and privileges enjoyed by a Member (under the Act, this Agreement, or otherwise) in its capacity as a Member; and (iv) all obligations, duties, and liabilities imposed on a Member (under the Act, this Agreement or otherwise) in its capacity as a Member.

Membership Interests shall be represented solely by Units of one or more classes including, without limitation, Common Units and Profits Interest Units.

14.16.  Net Cash Flow.  The "Net Cash Flow" is the LLC's total Net Profits derived from its operations, the operations of the Business, reduced by any principal payments on any LLC debts, expenditures to acquire or improve LLC assets, any proceeds from the sale, exchange, or refinance of LLC assets outside the ordinary course of business, and such other reasonable reserves and additions thereto as the Manager shall determine to be advisable and in the best interests of the LLC.

14.17.  Net Cash Flow from Sale.  "Net Cash Flow from Sale" means the net cash proceeds (i.e., gross receipts from any transaction, reduced by debts required to be paid in such transaction and the expenses incurred in such transaction), less any portion thereof used to establish reasonable reserves as determined appropriate by the Manager, if any, realized by the LLC from (a) a sale or other disposition of all or a part of the LLC's Business assets other than in the ordinary course of business or (b) the refinancing of all or a part of the LLC's assets.

14.18.  Net Profits and Net Losses.  "Net Profits" and "Net Losses" mean, for each fiscal year or other period, an amount equal to the LLC's taxable income or loss for such fiscal year or period, determined in accordance with Code § 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

14.18.1.    Any income of the LLC that is exempt from federal income tax and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition shall be added to such taxable income or loss;

14.18.2.    Any expenditures of the LLC described in Code § 705(a)(2)(B) or treated as § 705(a)(2)(B) expenditures pursuant to Regulations § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Net Profits or Net Losses pursuant to this definition, shall be subtracted from such taxable income or loss;

14.18.3.    Gain or loss resulting from any disposition of LLC property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Fair Market Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Fair Market Value; and

14.18.4.    In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period.

14.19.  Outstanding Preferred Contribution.  "Outstanding Preferred Contribution" means, with respect to any Member, the excess, if any, of (A) the aggregate amount of such Member's initial capital contribution; less (B) the cumulative amount of all distributions made by the Company to such Member pursuant to Sections 4.2.1 and, 4.2.2 hereof.

14.20.  Permitted Transfer.  A "Permitted Transfer" is any Transfer of any Membership Interest to (i) a lineal descendant or spouse of the transferor Member (ii) any trust exclusively for the benefit of lineal descendants and/or a spouse of the transferor Member or (iii) a subsidiary or controlled affiliate of the transferor Member.

14.21.  Prime Rate.  The "Prime Rate" shall be equal to "Prime Rate" published in the Wall Street Journal on the date of closing.

14.22.  Profits Interest Members.  The "Profits Interest Members" means the holders of Profits Interest Units who have been admitted as Members of the LLC pursuant to the terms of this Agreement.

14.23.  Profits Interest Units.  "Profits Interest Units" means the Units having the privileges, preference, duties, liabilities, obligations, and rights specified with respect to "Profits Interest Units" in this Agreement.

14.24.  Regulations.  The term "Regulations" means the income tax regulations promulgated by the United States Department of the Treasury and published in the Federal Register for the purpose of interpreting and applying the provisions of the Code, as such Regulations may be amended from time to time, including corresponding provisions of applicable successor regulations.

14.25.  Regulatory Allocations.  "Regulatory Allocations" means the allocations provided and required by the provisions contained in Exhibit B, attached hereto.

14.26.  Securities Laws.  "Securities Laws" means, collectively, the Securities Act of 1933 and other applicable federal or state securities or blue sky laws, each as amended, or any successor federal or state statute of any such laws, and the rules and regulations thereunder, which shall be in effect at the time.

14.27.  Supermajority Vote.  A "Supermajority Vote" means an affirmative vote or written approval of the Members holding more than eighty percent (80%) of the Common Units entitled to vote on that particular matter.

14.28.  Tax-Sensitive Adjustments.  The "Tax-Sensitive Adjustments" are all adjustments to a Member's Capital Account that are not specifically required under the terms of this Agreement, but that are required by Regulations § 1.704-1(b)(2)(iv) ("Maintenance of Capital Accounts"), as amended. These adjustments shall be made annually unless applicable regulations require a more frequent adjustment.

14.29.  Transfer.  A "Transfer" of a Member's interest includes any sale, pledge, encumbrance, gift, bequest, or other transfer or disposition of any portion of a Membership Interest, or permitting it to be sold, encumbered, attached, or otherwise disposed of, or changing its ownership in any manner, whether voluntarily, involuntarily, or by operation of law; provided, however, that the term shall not include any assignment of any Membership Interest to another Member or to any trust that is entirely revocable by the assignor, and such trust shall be treated as the agent of the assignor, and any subsequent disposition of such Membership Interest by such trust shall be deemed to have been made by the trust's settlor or grantor.

14.30.  Unanimous Vote.  The term "Unanimous Vote" means an affirmative vote or written approval of the Members holding one hundred percent (100%) of the Common Units entitled to vote on that particular matter.

14.31.  Units.  The term "Units" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including the Common Units and the Profits Interest Units; provided, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations, and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations, and rights.

**[Signature Page follows]**

**IN WITNESS WHEREOF**, the undersigned Members have executed this Operating Agreement, under seal, to be effective as of the Effective Date noted above.

<u>**COMMON UNITS MEMBER**</u>:

**COLUMBIA HEALTH LLC**

By: _____  08/02/2024

Name: Edward C. Mann, IV
Title:  Manager

<u>**MANAGER**</u>:

**COLUMBIA HEALTH LLC**

By: _____  08/02/2024

Name: Edward C. Mann, IV
Title:  Manager

## Exhibit A
## Membership Interests

| Member Name and Address | Common Units | Profits Interest Units | Capital Contribution |
|---|---|---|---|
| Columbia Health, LLC<br>1845 St. Julian Place<br>Columbia, South Carolina 29204 | 800 | 0 | $[•] |
| John Cho<br>[•]<br>[•] | 0 | 50* | $0.00 |
| Ellen Smoak<br>[•]<br>[•] | 0 | 50 | $0.00 |
| Reserved by CH for issuance to new and/or existing Members | 0 | 100 | $0.00 |

* An additional fifty (50) Profits Interest Units will be issued to John Cho upon the competition and successful implementation of a production automation system to be used in the operation of the Business.

## Exhibit B
## Regulatory Allocations

The following Regulatory Allocations shall be made in the following order:

**1.      Minimum Gain Chargeback.** Except as otherwise provided in Regulations § 1.704-2(f), if there is a net decrease in Company Minimum Gain during any fiscal year, each Member shall be specially allocated items of LLC income and gain for such fiscal year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations § 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations § 1.704-2(f)(6) and § 1.704-2(j)(2). This Paragraph is intended to comply with the minimum gain chargeback requirement in Regulations § 1.704-2(f) and shall be interpreted consistently therewith.

**2.      Member Minimum Gain Chargeback.** Except as otherwise provided in Regulations § 1.704-2(i)(4), notwithstanding any other provision in this Exhibit or the Agreement, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations § 1.704-2(i)(5), shall be specially allocated items of LLC income and gain for such fiscal year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt, determined in accordance with Regulations § 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations § 1.704-2(i)(4) and § 1.704-2(j)(2). This Paragraph is intended to comply with the minimum gain chargeback requirement in Regulations § 1.704-2(i)(4) and shall be interpreted consistently therewith.

**3.      Qualified Income Offset.** In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulations § 1.704(b)(2)(ii)(d)(4), (5), or (6), items of LLC income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible, provided that an allocation pursuant to this Paragraph shall be made only if and to the extent that the Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Exhibit or the Agreement have been tentatively made as if this Paragraph were not in this Agreement.

**4.      Gross Income Allocation.** In the event any Member has an Adjusted Capital Account Deficit at the end of any fiscal year, such Member shall be specially allocated items of LLC income and gain in the amount of such deficit as quickly as possible, provided that an allocation pursuant to this Paragraph shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Exhibit and the Agreement have been made as if this Paragraph and Paragraph (3) were not in this Agreement.

**5.      Nonrecourse Deductions.** Nonrecourse Deductions for any fiscal year shall be specially allocated to the Members in proportion to their share of profits and losses.

**6.      Member Nonrecourse Deductions.** Any Member Nonrecourse Deductions for any fiscal year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations § 1.704-2(i)(1).

**7.     Section 754 Adjustments.**  To the extent an adjustment to the adjusted tax basis of any LLC asset pursuant to I.R.C. § 734(b) or I.R.C. § 743(b) is required, pursuant to Regulations § 1.704-1(b)(2)(iv)(m)(2) or (m)(4), to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of such Member's interest in the LLC, the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members in accordance with their interests in the LLC in the event Regulations § 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Regulations § 1-704-1(b)(2)(iv)(m)(4) applies.

**8.     Definitions.**  The following terms shall for purposes of this Exhibit and elsewhere in this Agreement have the following definitions:

(A)     "Adjusted Capital Account Deficit" means with respect to any Member (or assignee), the deficit balance, if any, in such Member's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i)     Credit to such Capital Account any amount which such Member is deemed to be obligated to restore pursuant to the next to the last sentences in Regulations § 1.704-2(g)(1) and § 1.704-2(i)(5); and

(ii)     Debit to such Capital Account the items described in Regulations §§ 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

The foregoing definition of "Adjusted Capital Account Deficit" is intended to comply with the provisions of Regulations § 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(B)     "Company Minimum Gain" shall have the same meaning as "partnership minimum gain" as set forth in Regulations § 1.704-2(b)(2).

(C)     "Member Nonrecourse Debt" has the same meaning as "partner nonrecourse debt" as set forth in Regulations § 1.704-2(b)(4).

(D)     "Member Nonrecourse Debt Minimum Gain" has the same meaning as "partner nonrecourse debt minimum gain" as set forth in Regulations § 1.704-2(i)(2).

(E)     "Member Nonrecourse Deductions" has the same meaning as "partner nonrecourse deductions" as set forth in Regulations § 1.704-2(i)(1).

(F)     "Nonrecourse Deductions" has the same meaning as is set forth in Regulations § 1.704-2(b)(1).

(G)     "Nonrecourse Liability" has the same meaning set forth in Regulations § 1.704-2(b)(3).

**Exhibit C**
**Form of Joinder Agreement**

**BIOHEALTH RX, LLC**
**JOINDER TO OPERATING AGREEMENT**

THIS **JOINDER TO THE OPERATING AGREEMENT** (this "Agreement") is dated effective as of _____, 20___, by and between BIOHEALTH RX, LLC, a South Carolina limited liability company (the "LLC") and the undersigned (the "New Member").

**RECITALS**

**WHEREAS**, the current Common Members of the LLC (the "Existing Members") have unanimously approved the admission of New Member and others to the LLC; and

**WHEREAS**, the LLC and Existing Members require execution of this Agreement as a condition precedent to the admission of New Member.

**NOW, THEREFORE**, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties hereto, the parties agree as follows:

1.      New Member is hereby made a party to the Operating Agreement of the LLC dated June ___ 2024, as it may be or have been further amended or restated from time to time (the "Operating Agreement"). New Member is being admitted to the LLC as a "Profits Interest Member," as such term is defined in the Operating Agreement and New Member hereby agrees to be bound by all of the terms and conditions set forth in the Operating Agreement. Simultaneous with the execution of this Agreement, the LLC issues to New Member the Profits Interest Units identified in the signature block below.

2.      This Agreement shall constitute a counterpart signature page to the Operating Agreement and is deemed a part thereof.

3.      Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in the Operating Agreement.

4.      This Agreement is binding upon the parties hereto and their permitted successors and assigns.

5.      This Agreement may be executed in one or more counterparts, and by electronic signature, each of which shall be deemed an original, but all of which when taken together, shall constitute one and the same instrument.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the LLC and New Member have executed this Agreement as of the date first indicated above.

**LLC:**                                                      **NEW MEMBER:**
**BIOHEALTH RX, LLC**
By: Columbia Health, LLC, Manager

By: _____                 _Ellen Smoak_          07/29/2024

Its: Member   E. Coke Mann, IV

                                         50              Print Name   Ellen Smoak

Profits Interest Units issued: _____         Address for Notice:

                                                       2355 Thomas Ave
                                                       Unit 806
                                                       Dallas, TX 75201

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ELLEN SMOAK** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO.  3:25-cv-919** |
| | § | |
| | § | |
| **BIOHEALTH RX, LLC, EDWARD COKE** | § | |
| **MANN III, and EDWARD COKE MANN** | § | |
| **IV** | § | |
| | § | |
| *Defendants.* | § | |

**Affidavit in Support of Special Appearance to Challenge**
**Personal Jurisdiction on behalf of Edward Coke Mann, III**

BEFORE ME, the undersigned authority, on this day personally appeared Edward Coke Mann, III, who under oath stated as follows:

1.      My name is Edward Coke "Bud" Mann, III. I am over the age of eighteen (18) and I am legally competent to make this affidavit. The statements in this affidavit are true, based on my personal knowledge, and made voluntarily without duress. I submit this affidavit in support of my motion to contest this Court's personal jurisdiction over me in the above-captioned action.

2.      I am a resident of the State of South Carolina. I do not live on Country Club Drive. I have never lived in Texas.

3.      I was not visiting the home of my son, Edward Coke ("Coke") Mann, IV, who lives on Country Club Drive, on March 19, 2025 at 3:30 pm, or anytime that day. I have not visited the residence of Coke Mann since at least December 2024.

<div style="border:1px solid black; text-align:center;">

**EXHIBIT**

**2**

</div>

28

4.      I have not authorized my son, Coke Mann, to accept service of process on my behalf.

5.      I was not personally served with the summons and complaint in this action on or about March 19, 2025. I deny that I have ever been served with the summons and complaint.

6.      I am the founding partner and Chief Executive Officer of Columbia Development Group, LLC ("CDG"), a South Carolina limited liability company that has maintained its principal place of business in Columbia, South Carolina, since 2006.

7.      CDG is a member of Columbia Health LLC ("CH"), another South Carolina limited liability company, in which I hold an indirect financial interest. CH was formed in February 2024 and has continuously maintained its principal place of business in Columbia, South Carolina.

8.      I have not traveled to Texas since February 28, 2024, before BioHealth RX, LLC ("BioHealth") was incorporated. Following BioHealth's incorporation, I did not travel again to Texas to oversee or engage in any business or financial operations of BioHealth. Instead, I remained a passive investor in BioHealth through my membership in CDG, which held an interest in CH, which in turn held an interest in BioHealth.

9.      I have no telephone listing, real or personal property, lease agreements, or bank accounts in Texas. I have never personally entered into a contract with a Texas resident, recruited Texas residents for employment, directly conducted business in Texas, employed individuals in Texas, or derived income from the State of Texas. To the best of my knowledge, I have not consented to jurisdiction in Texas through any contract, waiver, or voluntary submission. I do not consent to jurisdiction in Texas in this case.

10.     To the best of my knowledge and memory, I met Ellen Smoak one time in person in February 2024 and I spoke with her for no more than two hours at that time. I also saw her one

later time in Columbia, SC, when she came to our office. I do not recall otherwise speaking with Ms. Smoak whether in person, over the phone or through text messages at any other time. I may have been included in emails to or from Ms. Smoak during her professional affiliation with BioHealth, but to the best of my knowledge, I have never directly corresponded with her.

Edward Coke "Bud" Mann, III

Sworn to and subscribed before me

this 24 day of April, 2025.

Notary Public for South Carolina

My Commission Expires: 9/8/2025

30