**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ELLEN SMOAK,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | **Civil Action No. 3:25-cv-00919** |
| **v.** | § | |
| | § | |
| | § | |
| **BIOHEALTH RX, LLC,** | § | |
| **EDWARD COKE MANN III, and** | § | |
| **EDWARD COKE MANN IV,** | § | |
| | § | |
| *Defendants*. | § | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO MOTION TO DISMISS UNDER RULE 12(B)(1) AND (3)**

---

COMES NOW Plaintiff, Ellen Smoak, and files this, her Response in Opposition to Defendants' Motion to Dismiss Under Rule 12(b)(1) and (3), and in support thereof respectfully shows the Court as follows:

## I.   INTRODUCTION

1. This case is not just about contracts—it is about exploitation, harassment, and retaliation carried out long before any contract was ever signed. Plaintiff Ellen Smoak was lured into a high-stakes startup venture by promises of partnership and respect, only to find herself subjected to humiliating sexual misconduct and systematically pushed out of the very business she helped build. Now, Defendants ask this Court to force those deeply personal and pre-contractual wrongs into arbitration, relying on a boilerplate clause from an Operating Agreement that was signed months after the worst of the conduct occurred.

2.  The law does not support such a maneuver. The arbitration clause invoked by Defendants is narrow. It governs only disputes that arise out of or relate to the Operating Agreement—not every dispute that might tangentially involve the parties. As the Fifth Circuit and district courts within it have made clear, parties may not be compelled to arbitrate claims that fall outside the scope of their agreement, particularly where the claims predate the contract and rest on legal duties wholly separate from it.

3.  Ms. Smoak's claims for sexual harassment and intentional infliction of emotional distress arise from conduct that began in 2022 and intensified through early 2024. The Operating Agreement was not signed until July 29, 2024, and contains no retroactive language. These claims are rooted in tort, not contract. They can and must be heard in court.

4.  The Court should deny Defendants' motion to compel arbitration of those claims. To hold otherwise would be to permit an arbitration clause to operate as a shield for misconduct it was never meant to cover.

## II.  FACTUAL SUMMARY

5.  Plaintiff Ellen Smoak's professional relationship with Defendant Edward Coke Mann IV began in 2020 during the COVID-19 pandemic. Over the next several years, the parties collaborated on multiple ventures, including Ghost Dog Robotics and Guthrie's Chicken, with Mann consistently promising Ms. Smoak that she would hold an equity interest and leadership role in his business enterprises. Plaintiff's Original Petition, attached as Exhibit A, ¶¶ 15, 37. These promises were never formalized in writing during that period.

6.  By mid-2023, the relationship shifted markedly. Mann began engaging in sexually inappropriate conduct toward Ms. Smoak, including sending unsolicited, AI-generated explicit images of her and repeatedly pressuring her to send him explicit content. Ex. A, ¶¶ 20–21, 46.

Despite this behavior, Ms. Smoak continued working on brand development and business outreach for what would become BioHealth RX, relying on Mann's repeated verbal assurances that she would receive a 5% equity stake.  Ex. A, ¶¶ 17, 33–34, 42–43.

7.   In March 2024, during an in-person meeting in South Carolina, Mann again promised Ms. Smoak an equity interest, this time in BioHealth RX and its planned national expansion. This promise was allegedly made in the presence of third parties and supported by financial spreadsheets showing billion-dollar projections. Ex. A, ¶ 17.  Shortly thereafter, in April 2024, during a business trip to Houston, Mann booked a shared hotel room and gave Ms. Smoak a sex toy. When she rejected his advances, Mann responded by sidelining her professionally—excluding her from meetings, reassigning responsibilities, and marginalizing her role within the company. Ex. A, ¶¶ 18–19, 48.

8.   These retaliatory efforts intensified throughout the summer of 2024. Despite playing a critical role in early business development, Ms. Smoak was kept in the dark about BioHealth RX's operational launch and denied access to essential business information, including pricing, order fulfillment, and customer service protocols.   Ex. A, ¶ 24. In August 2024, she was presented with a formal employment agreement—months after it had been promised—but was swiftly stripped of her pay and removed from her Director of Sales title.   Ex. A, ¶¶ 25–26.

9.   The Operating Agreement that Defendants rely on to invoke arbitration was not signed by Ms. Smoak until July 29, 2024  (Operating Agreement, attached as  Exhibit B at p. 20)—well after the bulk of the harassing and retaliatory conduct had occurred. The agreement contains no language indicating retroactive effect. Ex. B, § 12.14. Nonetheless, Defendants argue that claims arising from alleged promises regarding equity, compensation, and involvement in BioHealth RX's

operations must be dismissed and compelled to arbitration under this agreement.   Def. Mot. at 1, 17–19.

10. However, the claims for sexual harassment and intentional infliction of emotional distress arise from conduct that occurred before the Operating Agreement's execution and derive from legal duties entirely independent of that agreement.   Ex. A, ¶¶ 46–53. They do not require reference to, or enforcement of, the agreement's terms and are therefore outside the scope of any purported obligation to arbitrate.

### III.   LEGAL STANDARD

11. Federal courts evaluating a motion to compel arbitration under the Federal Arbitration Act ("FAA") apply a two-step framework:

    a.   Whether a valid agreement to arbitrate exists between the parties; and

    b.   Whether the dispute in question falls within the scope of that agreement.

*See Pennzoil Expl. & Prod. Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1065 (5th Cir. 1998); *Ford v. NYLCare Health Plans of Gulf Coast*, 141 F.3d 243, 250 (5th Cir. 1998).

12. While federal policy strongly favors arbitration, "a party cannot be compelled to submit any dispute to arbitration which he has not agreed to submit." *United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 408 (5th Cir. 1990) (*citing AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 648 (1986)). The Supreme Court has emphasized that § 4 of the FAA "does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed in the manner provided for in [the parties'] agreement.'" *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474–75 (1989) (quoting 9 U.S.C. § 4) (emphasis in original).

13. When assessing whether a dispute falls within the scope of an arbitration agreement, courts distinguish between broad clauses—those covering claims "arising out of or relating to" the agreement—and narrow clauses, which limit arbitration to claims strictly "arising under" the agreement. *See Coffman v. Provost & Umphrey Law Firm, L.L.P.*, 161 F. Supp. 2d 720, 725 (E.D. Tex. 2001); *Complaint of Hornbeck Offshore (1984) Corp. v. Coastal Carriers Corp.*, 981 F.2d 752, 754 (5th Cir. 1993).

14. Importantly, "[a]rbitration should not be denied 'unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that could cover the dispute at issue.'" *Mar-Len of La., Inc. v. Parsons-Gilbane*, 773 F.2d 633, 636 (5th Cir. 1985). However, that presumption favoring arbitration does not apply where the clause is clearly narrow and the claims at issue do not relate to the agreement at all. *See Coffman*, 161 F. Supp. 2d at 727 (declining to compel arbitration where claims predated the agreement and were not contractually based).

15. Accordingly, where—as here—a party seeks to compel arbitration of statutory or tort claims that (1) predate the agreement and (2) do not require interpretation or enforcement of the agreement's terms, courts routinely find the claims fall outside the scope of the arbitration clause

## IV.   ARGUMENT & AUTHORITIES

### A. The arbitration clause is narrow and only applies to disputes arising from the Operating Agreement itself.

16. The arbitration clause at issue provides that "[a]ny controversy or claim arising out of or related to this Agreement or the breach thereof" must be resolved by binding arbitration. Ex. B, § 12.14 This language—while broader than clauses limited to disputes "arising under" an agreement—is still considered narrow under Fifth Circuit precedent where the clause ties arbitration to the terms or performance of the agreement itself. In *Coffman*, the court construed a

clause requiring arbitration of "any dispute or claim arising under this partnership agreement" as narrow, and declined to extend it to claims that did not require interpretation or enforcement of the agreement. 161 F. Supp. 2d at 725–26.

17. Here, the clause similarly limits arbitration to claims that arise from or relate to the Operating Agreement—not merely from the parties' broader business relationship. Notably, it omits any reference to "employment," "personal conduct," or "statutory claims," and lacks the sweeping "any and all disputes" language that courts construe as broad. *See Hornbeck Offshore (1984) Corp.*, 981 F.2d at 754 (distinguishing narrow from broad clauses).

18. The fact that the clause mandates arbitration of claims "related to" the agreement does not render it unlimited. As courts repeatedly hold, arbitration is a matter of consent, and "[a] party cannot be compelled to submit any dispute to arbitration which he has not agreed to submit." *United Offshore Co*., 899 F.2d at 408 (*citing AT&T Techs., Inc.*, 475 U.S. at 648).

**B. Ms. Smoak's claims for sexual harassment and emotional distress arose before she executed the Operating Agreement.**

19. It is undisputed that Ms. Smoak did not sign the Operating Agreement until July 29, 2024. Ex. B at p. 20. By that point, the conduct giving rise to her claims for sexual harassment and intentional infliction of emotional distress had largely already occurred. According to the Petition, Mann's harassment—including repeated inappropriate messages, demands for explicit photos, AI-generated sexual imagery, and an incident involving a sex toy during a business trip—began as early as 2022 and escalated through the first half of 2024. Ex. A, ¶¶ 16–21, 46–49.

20. In *Coffman*, the court expressly held that claims arising before the effective date of an arbitration agreement are not subject to arbitration unless the agreement contains clear retroactivity language—which the clause here does not. 161 F. Supp. 2d at 726–27. Courts routinely reject attempts to retroactively apply arbitration clauses in the absence of express language to that effect.

*See also Security Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 373 (6th Cir. 1999) (refusing to apply arbitration clause to conduct under earlier contracts); *Hendrick v. Brown & Root, Inc.*, 50 F. Supp. 2d 527, 535 (E.D. Va. 1999) (same).

21. Retroactively applying the clause here would not only defy the agreement's plain language, but would also deprive Ms. Smoak of her vested right to litigate claims that had already accrued.

### C. The harassment and IIED claims arise from legal duties independent of the Operating Agreement and do not require its interpretation or enforcement.

22. Even if the conduct had occurred after the agreement's execution, Ms. Smoak's claims for sexual harassment and intentional infliction of emotional distress would still fall outside the scope of the arbitration clause because they arise from legal duties imposed by statute and common law, not from the Operating Agreement itself.

23. Courts consistently hold that tort and statutory claims are not arbitrable under narrow clauses unless they are "interwoven with" the contract. *Ford v. NYLCare Health Plans of Gulf Coast*, 141 F.3d 243, 250 (5th Cir. 1998); *Coffman*, 161 F. Supp. 2d at 732. In *Ford*, the Fifth Circuit applied the "interwoven" standard and held that a claim must depend on the agreement to fall within a clause's scope. Similarly, in *Brown v. Trans World Airlines, Inc.*, the court declined to compel arbitration of Title VII claims, even where the agreement prohibited similar conduct, because the statutory claims were "fully independent of the contract." 127 F.3d 337, 342 (4th Cir. 1997).

24. Here, Ms. Smoak's harassment and IIED claims stand entirely on their own. They do not allege breach of the Operating Agreement, nor do they require a court to interpret or apply any of its terms. They could be asserted even if the agreement had never existed. To compel arbitration of these claims would be to override clear Fifth Circuit authority and the limits of the parties'

actual agreement. As *Coffman* emphasized, "a party may not be forced to arbitrate claims it did not agree to arbitrate"—and that principle applies with full force here.

## V.   CONCLUSION

25. Defendants ask this Court to compel arbitration of claims that arose long before any agreement to arbitrate existed. But the law draws a clear line: a party may only be compelled to arbitrate what it has agreed to arbitrate. Here, the Operating Agreement was signed after the misconduct occurred, contains no retroactive language, and governs only disputes arising out of the agreement itself—not torts rooted in personal misconduct.

26. Ms. Smoak's claims for sexual harassment and intentional infliction of emotional distress are grounded in legal duties entirely independent of the Operating Agreement. They are not covered by its arbitration clause and should proceed in court, as the law requires.

## VI.   PRAYER

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Deny Defendants' motion to dismiss or compel arbitration as to Plaintiff's claims for sexual harassment and intentional infliction of emotional distress;

2. Alternatively, should the Court compel arbitration of other claims, sever and stay those tort claims pending arbitration;

3. Award such other and further relief to which Plaintiff may be justly entitled

Respectfully Submitted,

FARMER & COKER, PLLC

/s/*Kaitlyn M. Coker*
KAITLYN M. COKER
State Bar No. 24115264
kaitlyn@farmercoker.com
KYLE A. COKER
State Bar No. 24115353

kyle@farmercoker.com

901 Main St., Ste. 5330
Dallas, Texas 75202
Tel:    (832) 240-1047

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of June, 2025, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF electronic filing system in accordance with Rule 5(b)(2)(E) of the Federal Rules of Civil Procedure and Local Rule 5.1(d), which constitutes service under the Federal Rules of Civil Procedure.

/s/*Kaitlyn M. Coker*
Kaitlyn M. Coker
Farmer & Coker, PLLC